## POCOMOKE GUANO CO. et al. v. EASTERN TRANSP. CO.

(Circuit Court of Appeals, Fourth Circuit. November 7, 1922.)

### No. 1995.

1. **Shipping ⬅⮞207—Implied warranty of seaworthiness held not to preclude limitation of liability.**

On the hiring of a barge by telephone from the agent of the corporation owner to convey the cargo from a steamship in the harbor to a nearby factory, any warranty of seaworthiness that may be implied does not operate as an express warranty, to preclude the owner from claiming exemption from liability under the limitation of liability statute.

2. **Shipping ⬅⮞205, 208—Limitation of liability by corporation.**

Corporations are entitled to the benefit of limitation of liability under Rev. St. § 4283 et seq. (Comp. St. § 8021 et seq.), from conditions to which they are not privy and of which they have no knowledge, and they are chargeable with knowledge of the existence of defects, or become privy to acts of negligence causing the same only when persons representing the corporation in such capacities as to speak for it are guilty of some negligence or omission to maintain the vessel in seaworthy condition.

3. **Shipping ⬅⮞207—Corporation owner may limit liability for loss due to negligence of repairer.**

A corporation owner is exempt from liability for negligence of third persons employed to repair and put the vessel in seaworthy condition, where it has in good faith exercised due diligence and care in the selection of such persons.

4. **Shipping ⬅⮞208—Owner of barge held entitled to limit liability for loss of cargo.**

The sinking of a barge through the breaking of a corroded iron discharge pipe from the toilet *held* not with the privity or knowledge or through negligence of the owner which precluded it from limiting its liability for loss of the cargo; it appearing that the pipe was of a kind in general use and that the barge had but recently come from a reputable repair yard to which it had been delivered to be overhauled and such repairs made as found to be required.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Suit in admiralty by the Pocomoke Guano Company and another against the Eastern Transportation Company, owner of the barge Columbia. From a decree granting limitation of liability to respondent, libelants appeal. Affirmed.

For opinion below, see 278 Fed. 745.

John H. Skeen, of Baltimore, Md. (Bigham, Englar & Jones, of New York City, on the brief), for appellants.

George W. P. Whip and Samuel K. Dennis, both of Baltimore, Md., for appellee.

Before KNAPP and WADDILL, Circuit Judges, and GRONER, District Judge.

WADDILL, Circuit Judge. On or about the 21st day of June, 1920, the barge Columbia, owned by the appellee Eastern Transportation Company, was hired by the libelant, the Pocomoke Guano Company, to receive from the steamship Trevier, then in the harbor of

Norfolk, on account of the libelant and intervening petitioner herein, the Société des Potasses D'Alsace, some 650 tons of manure salt known as sylvinite fertilizer material, to transport the same to libelant's plant at Money Point and the intervener's warehouse in the immediate vicinity. The hiring was through Capt. A. J. Hudson, agent of the appellee, at Norfolk, over the telephone, had with A. W. Olmsted, purchasing agent for the libelant. No formal contract for hire or charter party was entered into. The barge was then lying in Norfolk harbor, and was at once placed alongside the ship, and the unloading of the cargo proceeded with, taking about two days to complete.

On the evening of the 23d of June, about 5:30, when the barge was still alongside the steamer, and the unloading of the freight about completed, it began to fill with water, and sank in a short time, before relief could be afforded, either by its own pumps, or the aid of tugs, or otherwise, although it was moved to the nearby flats by a gasoline launch. An effort was made to save the cargo, but by reason of its soluble nature, when subjected to water, it became a total loss. As soon as it was practicable to do so, the barge was raised; it being impossible to discover the cause of the sinking while it was in the water. It was then taken to Baltimore, and placed on the ways at the shipyard of Charles L. Rohde & Sons. Two days were spent there in an endeavor to discover the leak, even going so far as to flood the barge, without success. Later it was found that an iron pipe connected with the toilet on the barge had been broken at a point between the outer skin and inner sheathing of the side of the barge, where the pipe was completely obscured from view, and that the water flowing through this break had caused the sinking of the barge.

The libel in this case was filed on the 6th day of January, 1921, and the intervening libel on the 2d day of May, 1921, to recover about $25,000 for loss of the cargoes, caused by the unseaworthiness of the barge. The defense interposed was that the vessel at the time of entering upon the undertaking was in seaworthy and proper condition, and had been thoroughly overhauled and tested for leaks immediately before sinking, and no water had been found, and that the cause of the flooding was the breaking of the iron pipe connected with the toilet by a sudden jar or strain to the barge after it began loading alongside the steamship. The respondent further petitioned for limitation of liability pursuant to the provisions of sections 4283, 4284, and 4286 of the United States Revised Statutes (6 Fed. Stat. Ann. p. 336 et seq. [Comp. St. §§ 8021, 8022, 8024].

The District Court upon full consideration of the testimony, part by depositions and part orally before the court, found and decided that the barge was unseaworthy at the time of entering into the employment, and hence that the provisions of the Harter Act (Comp. St. §§ 8029–8035) did not relieve the appellee from liability, but that appellee was entitled to the benefit of exemption of liability under the sections aforesaid, the unseaworthiness of the barge not being with the privity and knowledge of the appellee, who had in all respects exercised due diligence to maintain the same in seaworthy condition.

From that decision this appeal was taken. The sole assignment of error is as to the correctness of the decision of the District Court in according to the barge owner the benefit of the exemption of liability under the limitation of liability sections aforesaid.

[1] The learned judge of the District Court in his opinion refers especially to the case of Pendleton v. Benner Line, 246 U. S. 353, 38 Sup. Ct. 330, 62 L. Ed. 770, and concluded that that case, if applicable, called for a decision contrary to the one rendered. The conclusion we have come to, as affects the liability in this case, is that the doctrine discussed in that case, and that line of decisions (Benner Line v. Pendleton, 217 Fed. 497, 133 C. C. A. 349; Id., 246 U. S. 353, 38 Sup. Ct. 330, 62 L. Ed. 770; The Julia Luckenbach, 235 Fed. 388, 148 C. C. A. 650; Luckenbach v. McCahan, 248 U. S. 139, 39 Sup. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522; Capital Transp. Co. v. Cambria, etc., Co., 249 U. S. 334, 335, 39 Sup. Ct. 292, 63 L. Ed. 631), has no application to the facts here. Those cases are to the effect that an individual owner expressly warranting the seaworthiness of a vessel cannot thereafter claim exemption from liability under the Limitation of Liability Act.

There was no express warranty in this case. An agent of the barge owner, a corporation, over the telephone contracted with a purchasing agent of the libelant to move the cargo in question from a steamship in the harbor to a nearby factory in the immediate vicinity. Nothing was signed, and no charter party entered into. Neither the corporation itself nor any of its officers signed any paper giving a warranty of any kind, or verbally did so. If from a phone message a warranty of the seaworthiness of a vessel may be implied, certainly it would not operate to create an express warranty on the part of the owner. The Ice King (C. C. A.) 261 Fed. 897.

In this case the sole question is whether, under its facts and circumstances, the respondent corporation should be denied the right of exemption from liability under the statute, by having imputed to it knowledge that the vessel was not seaworthy, thereby making it privy to the existence of such conditions. This question must be determined upon full consideration of all the testimony, and the reasonable and fair inferences to be drawn from the same. Upon this appeal the vessel must be treated as unseaworthy, as found by the District Court, and the case turns upon whether or not the corporation exercised the degree of care and caution reasonably to be required of it, to maintain the barge in seaworthy condition, and whether or not any representative of the company, whose knowledge would be imputed to the owner, was possessed of such facts as to create knowledge and privity of the owner within the meaning of the act of Congress.

[2, 3] Corporations, like others, are entitled to the benefit of limitation of liability from conditions to which they are not privy, and of which they have no knowledge, and they are chargeable with knowledge of the existence of defects, or become privy to acts of negligence causing the same, only when persons representing the corporation in such capacities as to speak for the same are guilty of some negligence

or omission to maintain the barge in seaworthy condition. They are likewise exempt from liability for the negligence of third persons employed to repair and put the barge in seaworthy condition, where they have, in good faith, exercised due diligence and care in the selection of such persons; that is to say, those trustworthy, experienced, and capable of performing the service, and of good reputation in the business. A few authorities bearing upon the barge's liability, under circumstances such as existed here, may be cited: Craig v. Continental Ins. Co., 141 U. S. 638, 646, 647, 12 Sup. Ct. 97, 35 L. Ed. 886; Quinlan v. Pew, 56 Fed. 111, 115, 117, 118, 5 C. C. A. 438; The Republic, 61 Fed. 109, 112, 113, 9 C. C. A. 386; The Annie Faxon, 75 Fed. 312, 315, 21 C. C. A. 366; Van Eyken v. Erie R. R. Co. (D. C.) 117 Fed. 712; The Tommy, 151 Fed. 570, 573, 81 C. C. A. 50; Eastern Dredging Co. (D. C.) 159 Fed. 541, 547; The Alola (D. C.) 228 Fed. 1006; The Richard F. Young (D. C.) 245 Fed. 503; Erie Lighter Co. No. 108 (D. C.) 250 Fed. 490, 494; People's Navigation Co. v. Toxey (C. C. A.) 269 Fed. 793.

[4] The barge had been used in the regular business of its owner, under a prudent master, who had commanded it for some 10 years; he and his family living on board. The barge was about 22 years old, and had been rebuilt about 11 years before the occurrence. She was subjected to an annual overhauling, by placing her in well-known and reputable shipyards. The owner's officers, and the superintendent and general managers of the shipyards, testified as to the thoroughness of the work done for the last two years; that is, in the spring of 1919 and 1920, the yards made such repairs as they found necessary, and put the barge in thorough seaworthy condition. At the time of the accident, the barge had come from the shipyard at Norfolk only a few days previously. In addition to those inspections, the barge was constantly under the care and supervision of regular employés and agents of the company, some of whom were experienced tugboat operators and builders, though its president, who testified, was inexperienced in that regard. As to the condition of the barge at the time of the accident, the company's agent at Norfolk, a man of long experience in handling, building, and supervising barges, and who employed the ship railway in this instance, and the superintendent of the shipbuilding plant, one of the largest and most reputable concerns at Norfolk, as also the barge's master, each testified strongly as to the sufficiency of the overhauling, and the barge's seaworthiness at the time.

Had the sinking been caused by an ordinary leak, it is inconceivable that the barge owner would have been denied exemption from liability under the facts of this case, where it had done everything that a prudent and diligent owner could do to keep the barge in seaworthy condition. Is a higher degree of diligence to be imposed as to hidden defects, such as developed here? We think not. The cause of the disaster was not discovered for some two days after the barge had been raised and placed upon the ways, and after it had been flooded as an experiment in an endeavor to find the leak. It seems that a sudden inflow of water came through a corroded or broken iron pipe con-

nected with the toilet, hidden from view. The general manager and superintendent of the Baltimore yard thus described the finding of the leak:

"Q. This pipe is simply a discharge pipe from the toilet, isn't it? A. Yes.

"Q. Through how much of its length does it run through an open space in the back of the hold in the stern? A. I guess about five feet.

"Q. And then passes through what—the ceiling? A. Passes through the ceiling and the outer skin—the outer planking.

"Q. What is the space between the ceiling and outer planking? A. Six inches.

"Q. The ceiling is simply what might be called the floor of the barge, just planks laid over to level up? A. Yes.

"Q. Would it be possible to examine the pipe below the ceiling with a little trouble? A. The only way to examine it below the ceiling is to cut the ceiling away.

"Q. That is not much of a job, is it? A. I do not think any man will ever let you cut any ceiling away, unless he has to do it.

"Q. When you overhauled in 1919, and spoke of examining the pipe, did you examine it between the ceiling and outer skin? A. We put our hand in and feel, and see if it was all right. You can shove your hand up on the inside of the pipe and feel around."

Should the barge owner be denied exemption from liability here? Was the barge unseaworthy at the time of the accident, with the knowledge and privity of the owner? Manifestly it was not. Taking into account the character of the defective appliance mentioned, it seems to us manifest that the owner did all that could reasonably be required looking to the maintenance and upkeep of the barge, and hence it is entitled to exemption from liability. If there was a failure of duty on the part of any one to discover the leakage, it was not on the part of the owner, as unobservable defects could only have been discovered by experienced persons, such as those to whom the work of the repair and overhauling of the barge had in good faith been delegated and intrusted, concerns in every way reliable and highly qualified to perform such duty. The owner should not be held responsible therefor, or denied exemption from liability under the circumstances.

Appellant specially insists that exemption should be denied because of the use of an iron pipe without a stop-valve attachment, and also because the repair of the barge was intrusted to appellee's superintendent, Capt. Bannister, who was not called as a witness by the appellee. Respecting the first of these positions, the lower court, we think correctly, held that the pipe in question was of the character in general use in the service in which the barge was used, and it was not customary to have stop-valve attachments.

As to the second point, we do not think the testimony establishes that Capt. Bannister was the superintendent of the company in the sense claimed. It is true the president once referred to him in his testimony as superintendent, who looked after the repairs; but it is manfest from the whole testimony, and from what was done in connection with the operation and maintenance of the barge, that he neither meant that Capt. Bannister was the superintendent of the company, or that he occupied any position of authority such as to control and direct its operation. Capt. Bannister was referred to by the master of the barge as the "shore captain," and with the exception of at-

tending, with Capt. Hudson, the company's agent at Norfolk, at the shipyard during the two days the barge was being overhauled there, it does not appear that he did anything whatever in connection with the control and operation of the barge. On the contrary, the whole evidence shows that this work was done through others, and that, especially at Norfolk, the making of the contract for the repair of the barge, and her control, were under the direction of Capt. Hudson, the experienced barge owner and operator above named, and the company's agent at Norfolk.

The decree of the District Court will be affirmed.

Affirmed.